UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
REYNALDO CARTAGENA,

                 Petitioner,            ORDER
                                                          04-CV-4329 (JS)
    -against-

MICHAEL CORCORAN, Superintendent,
Cayuga Correctional Facility,

                 Respondent.
----------------------------------------X
APPEARANCES:
For Petitioner:      Robert L. Moore, Esq.
                    Quesada & Moore, LLP
                    128 Avon Place
                    West Hempstead, NY 11552

For Respondent:      Glenn Green, Esq.
                    Suffolk County District Attorney's Office
                    Criminal Courts Building
                    200 Center Drive
                    Riverhead, NY 11901

SEYBERT, District Judge:

       On October 4, 2004, Petitioner Reynaldo Cartagena ("Petitioner") filed a petition, pro se, seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On November 22, 2004, the Court issued an Order directing Petitioner to show cause why his Petition should not be dismissed as time-barred by the one-year limitations period contained in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See 28 U.S.C. § 2244(d). On December 3, 2004, Petitioner submitted an affidavit alleging that the limitations period should be equitably tolled because his attorney compromised his efforts to file a timely petition. On May 5, 2005, the Court issued an Order allowing Petitioner 60 days

to obtain an attorney and scheduling an evidentiary hearing to determine whether Petitioner was entitled to equitable tolling. On April 13, 2006, the Court appointed counsel for Petitioner. In June 2007, after Petitioner's first appointed counsel failed to file supplemental papers with the Court and failed to respond to various communications, the Court appointed Petitioner's current counsel. On October 23, 2007, the Parties convened for an evidentiary hearing ("Hearing") before the Court. Following the Hearing, the Court requested additional briefing on the matter. The parties submitted post-hearing memoranda of law in November 2007, and Petitioner filed a response on December 3, 2007.

For the reasons set forth herein, the Petition is accepted as timely pursuant to 28 U.S.C. § 2244, as amended by the AEDPA.

## BACKGROUND

The following facts are taken from the record before the Court and the testimony of Mr. George Harmel, Esq., Ms. Aida Cartagena, Petitioner's sister, and Petitioner, who all appeared at the Hearing. The Court finds the testimony of all the witnesses credible.

In January 1996, a jury convicted Petitioner of two counts of Kidnapping in the Second Degree and two counts of Robbery in the First Degree. The judgment of conviction was rendered on January 25, 1996. On October 9, 2001, the Appellate Division,

Second Department, affirmed the conviction. People v. Cartagena, 287 A.D.2d 515, 731 N.Y.S.2d 469 (2d Dep't 2001). The New York State Court of Appeals denied Petitioner's request for leave to appeal on December 19, 2001. People v. Cartagena, 97 N.Y.2d 680, 764 N.E.2d 399 (2001). Petitioner did not seek a writ of certiorari from the Supreme Court of the United States. Petitioner's conviction therefore became final on March 20, 2002.[1]

Very soon after Petitioner's request for leave to appeal to the New York State Court of Appeals was denied, his family contacted George Harmel, an attorney. (Evidentiary Hr'g Tr. 52, Oct. 23, 2007.) At the outset, the Court notes that, while Harmel's testimony was quite candid and credible, Harmel indicated that he was taking Flecainide, a medication for arrhythmia, as well as numerous other medications, which caused memory lapses at the time of the Hearing as well as at the time in question. (Hr'g Tr. 39.) Harmel testified that he recalled a member of Petitioner's family retaining him to review the record on appeal and that Petitioner's "desire was to go with a federal habeas corpus" petition. (Hr'g Tr. 7.) Corroborating this fact, Petitioner submitted a copy of a letter from Harmel, dated September 26, 2002, entitled "Re: Appeal via Writ of Habeus [sic] Corpus." (Pet'r Ex. 2.) The letter discussed a habeas petition and stated, in

---

[1]As discussed more fully, infra, Petitioner had until March 20, 2003 to timely file a petition for habeas corpus.

pertinent part, "we intend to proceed with a Federal Writ of Habeus [sic] Corpus" and "[w]e will expedite this appeal in a timely fashion." (Id.) Harmel testified that he could not recall whether he told Petitioner that there was a time limitation on filing the habeas petition, nor whether Harmel was even aware that the AEDPA was in effect at the time. (Hr'g Tr. 17.)

Whether or not he was aware of any time limitations, Harmel failed to file the habeas petition by the March 20, 2003 deadline or at all. Harmel testified that he intended to pursue Petitioner's case at the state level, but failed to communicate this intention to Petitioner. (Hr'g Tr. 11-12.) Several reasons appear to have contributed to Harmel's failure to pursue and file a habeas petition as originally agreed upon with Petitioner. Harmel testified that a paralegal in his office handled all work on habeas petitions, and that this paralegal had possibly come to the conclusion that there was no federal claim to pursue. In any event, the paralegal was subsequently arrested for forging a Second Circuit Judge's signature on a writ of habeas corpus, which caused the release of two prisoners from a state prison. (Hr'g Tr. 13.) Federal agents seized documents from Harmel's office, which were later returned. Harmel "lost track of [Petitioner's] file," and failed to find it at any subsequent time. (Hr'g Tr. 13.) Harmel failed to communicate any of these mishaps to Petitioner. (Hr'g Tr. 14.)

4

To compound matters, Harmel began suffering a series of physical ailments in 2002, the same year in which Petitioner's family retained Harmel to file a habeas petition. Harmel battled pneumonia, morbid obesity, respiratory problems, and arrhythmia, putting him "out of commission" and rendering him, at times, physically unable to practice law. (Hr'g Tr. 19-20.) He established residency in Florida and traveled to New York to work, "trying to do as little as possible in the office." (Hr'g Tr. 20.) Harmel's physical ailments eventually caused him to completely stop working at some point during 2004. Throughout this time, Harmel failed to communicate to Petitioner that he was seriously ill, or that there were any problems with Petitioner's case. (Hr'g Tr. 21.) Harmel testified that the failure to file the habeas petition, and to communicate this fact to Petitioner, was "[Harmel's] fault," since he was "ashamed to tell clients that [he was] sick, not working, [and couldn't] do it." (Hr'g Tr. 21.)

After retaining Harmel, Petitioner spoke with him by telephone approximately three times. (Hr'g Tr. 45.) Aside from these communications, Petitioner testified that he made many unsuccessful attempts at reaching Harmel, sometimes calling "twice a week, three times a week." (Hr'g Tr. 45-46.) Harmel's office would inform Petitioner that Harmel was in a conference or was otherwise unavailable. Petitioner testified that during their last telephone conversation, in September or October of 2003, he

inquired into the timeliness of his habeas petition; Harmel told him not to worry and said that he would be able to get an extension if there was a problem. (Hr'g Tr. 46-47.) In addition to their phone conversations, Petitioner testified that Harmel sent him two letters that were destroyed in an incident at the Clinton Correctional Facility. (Hr'g Tr. 47.)

Ms. Cartagena, who retained Harmel on Petitioner's behalf, also testified at the Hearing. Ms. Cartagena also attempted to contact Harmel frequently — in person and by phone – in order to inquire into her brother's case. On one occasion, Harmel assured her to "leave this to me. We have time." (Hr'g Tr. 43.) Lastly, Harmel testified that while he had no recollection of representing that Petitioner's habeas petition was being worked on or almost done, his paralegal may have told Petitioner or his family that Harmel was working on the petition. (Hr'g Tr. 27.)

The last communication that Petitioner or his family received from Harmel was a letter, dated April 20, 2004 ("April 2004 letter"). The letter, mailed to Ms. Cartagena's address, stated, "I have spent a great deal of time on your case. Your sister has great concern for you. I wish for her to see me in two weeks; at that time I will go over with her what we can do for you." (Pet'r Ex. C.) The letter further stated that despite the small amount of money that the family had paid thus far, Harmel would continue to help Petitioner. Harmel testified that while the

signature on the letter was not his own, the contents appeared to be from him. (Hr'g Tr. 15.) The Court concludes that the April 2004 letter was sent at Harmel's direction or by someone in Harmel's office.

After receiving the April 2004 letter, Petitioner testified that he continued to call Harmel's office in an attempt to retrieve his paperwork, but never received a response. (Hr'g Tr. 50.) Moreover, Petitioner spoke with the prior attorney who had represented him at his state-court trial in order to have him call Harmel's office to inquire into the location of his paperwork. (Hr'g Tr. 56.) On October 4, 2004, approximately nineteen months after the deadline for filing had passed, Petitioner filed a pro se Petition for Writ of Habeas Corpus.

## DISCUSSION

I. AEDPA's Statute Of Limitations

The AEDPA established a one-year statute of limitations for "an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." See 28 U.S.C. § 2244(d)(1); Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997). The limitation period runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." See 28 U.S.C. § 2244(d)(1)(A). Petitioner's judgment of conviction became final on March 20, 2002, after the ninety-day period for seeking a

writ of certiorari from the Supreme Court had expired. See McKinney v. Artuz, 326 F.3d 87, 96 (2d Cir. 2003) (finding defendant's conviction was final ninety days after leave to appeal to the New York Court of Appeals was denied because defendants have ninety days to seek certiorari review before the Supreme Court). Therefore, Petitioner had until March 20, 2003 to timely file his petition. The Petition, however, was filed on October 4, 2004, over eighteen months past the deadline.

## II. Equitable Tolling

A petitioner may invoke the court's power to toll the AEDPA's one-year statute of limitations only in "'rare and exceptional circumstances'."[2] Doe v. Menefee, 391 F.3d 147, 159 (2d Cir. 2004) (quoting Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir. 2000)). In order to equitably toll the limitations period, "the petitioner must establish that 'extraordinary circumstances prevented him from filing his petition on time,' and that he 'acted

---

[2] The Court notes that the Supreme Court has recently stated that statutory time limits for taking an appeal are "jurisdictional," casting doubt on the viability of equitable tolling of the AEDPA's one-year limitation. Bowles v. Russell, 127 S. Ct. 2360, 2364, 168 L. Ed. 2d 96 (2007). Bowles, however, dealt with the untimely filing of a notice to appeal, and the Supreme Court has specifically noted that it has not decided whether equitable tolling applies to the AEDPA's one-year limitation period. See id. at 2362; Lawrence v. Florida, 127 S. Ct. 1079, 1085, 166 L. Ed. 2d 924 (2007). Until such time as the Supreme Court decides otherwise, the Court concludes that equitable tolling is potentially available to a petitioner who files an untimely habeas corpus petition. See Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir. 2000).

with reasonable diligence throughout the period he seeks to toll.'" Doe, 391 F.3d at 159 (quoting Smith, 208 F.3d at 17). The two prongs of the test are interconnected, requiring the petitioner to "'demonstrate a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing, a demonstration that cannot be made if the petitioner, acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances.'" Baldayaque v. United States, 338 F.3d 145, 150 (2d Cir. 2003) (quoting Hizbullahankhamon v. Walker, 255 F.3d 65, 75 (2d Cir. 2001)).

A. Extraordinary Circumstances

While "attorney error normally will not constitute the extraordinary circumstances required to toll the AEDPA limitations period, . . . at some point, an attorney's behavior may be so outrageous or so incompetent as to render it extraordinary." Baldayaque, 338 F.3d at 152 (emphasis in original). "[S]imple mistakes about the rules" for filing deadlines, for example, will likely constitute the type of "ordinary" attorney error that will fail to toll the limitations period, while a pattern of more egregious conduct that falls "far enough outside the range of behavior that reasonably could be expected by a client" will justify the application of equitable tolling. Id.; see also Smaldone v. Senkowski, 273 F.3d 133, 138-39 (2d Cir. 2001)

9

(concluding that attorney's incorrect belief that AEDPA's limitations period is reset, rather than tolled, while pursuing state remedies, did not constitute extraordinary circumstances); Geraci v. Senkowski, 211 F.3d 6, 9 (2d Cir. 2000) (finding that counsel's erroneous calculation of time remaining to file petition did not warrant equitable tolling).

In Baldayaque, for example, an attorney repeatedly failed to meet certain fundamental standards of conduct regarding the filing of a client's habeas petition. Despite the fact that his client "specifically directed" him to file a habeas petition, the attorney failed to file one at all. Baldayaque, 338 F.3d at 152. This failure violated the attorney's professional duty "'to defer to the client's wishes on major litigation decisions.'" Id. (quoting In re Agent Orange Prod. Liab. Litig., 800 F.2d 14, 17 (2d Cir. 1986)). Moreover, the attorney failed to conduct any research on the case, which would have revealed that the deadline for filing the petition had not passed. Id. Lastly, the attorney failed to explain the issues "to the extent reasonably necessary to permit [the client] to make informed decisions regarding the representation," and failed to keep the client up to date on the status of his case. Baldayaque, 338 F.3d at 152 (citing Connecticut Rule of Professional Conduct 1.4). Taken together, the court determined that the attorney's behavior was sufficiently egregious to constitute the type of "'extraordinary circumstances'

that would justify the application of equitable tolling." Id. at 152-53.

The conduct at issue in the instant case parallels that in Baldayaque. As in Baldayaque, Harmel was retained for the specific purpose of filing a habeas corpus petition, which he promised to "expedite . . . in a timely fashion." (Hr'g Tr. 7; Pet'r Ex. 2.) No such petition, however, was ever filed. While Harmel apparently did do some amount of research on the case, concluding that remedies may have remained available at the state level, he failed to communicate this information with Petitioner. (Hr'g Tr. 11-12.) If Harmel was aware of the approaching deadline for filing a habeas petition, or that the deadline had eventually passed, he likewise failed to inform Petitioner. (Hr'g Tr. 17, 21.) Moreover, Harmel failed to inform Petitioner that the paralegal in his office who handled habeas petitions had been arrested, that Petitioner's file had been lost, or that Harmel was suffering from a series of debilitating ailments that left him unable to practice law. (Hr'g Tr. 13-14, 19-21.) This failure to keep Petitioner "reasonably informed about the status of [his case]" and to explain the circumstances "to the extent reasonably necessary to permit [him] to make informed decisions regarding the representation," on top of his complete failure to file a petition, transgressed ordinary attorney error. Baldayaque, 338 F.3d at 152. Taken together, Harmel's conduct was sufficiently egregious to be

11

considered extraordinary. See id. at 152-53.

   B.   Reasonable Diligence

   Extraordinary circumstances alone, however, do not automatically trigger equitable tolling. Rather, a petitioner must demonstrate that such circumstances caused the petition to be untimely by showing that he "diligently pursued his application during the time that he seeks to have tolled." Doe, 391 F.3d at 175. "The standard is not 'extreme diligence' or 'exceptional diligence,' it is reasonable diligence." Baldayaque, 338 F.3d at 153 (emphasis in original). In other words, the court must inquire into whether Petitioner acted "as diligently as reasonably could have been expected under the circumstances." Id. (emphasis in original). "In the attorney incompetence context," these circumstances include "the purpose for which the petitioner retained the lawyer, his ability to evaluate the lawyer's performance, his financial and logistical ability to consult other lawyers or obtain new representation, and his ability to comprehend legal materials and file the petition on his own." Doe, 391 F.3d at 175 (citing Baldayaque, 338 F.3d at 153).

   In Baldayaque, for example, the petitioner sought out an attorney to file a habeas petition "at the earliest possible time." Baldayaque, 338 F.3d at 153. When the petitioner's wife and a local reverend visited the attorney to inquire into the status of his case, he told them that the deadline for filing a habeas

12

petition had passed; in fact, fourteen months remained within which he could have filed a timely petition. See id. at 148-49, 153. After this meeting, the attorney failed to meet with the wife and reverend, or to communicate directly with the petitioner. See id. at 149. The reverend called the attorney approximately once a month; the attorney assured her that he was simply "waiting for a court date" and that everything would work out. Id. Rather than pursuing the habeas petition, for which he had been retained, the attorney filed a "frivolous" motion requesting immediate deportation for his client, which was denied as outside the jurisdiction of the court. Id. The attorney then informed the reverend that no further steps could be taken in the case. See id.

Due to the petitioner's "lack of education and inability to speak or write English," his lack of funds, and his "incarceration and attendant lack of direct access to other forms of legal assistance," he was unable to consult or secure another attorney. Id. at 153. Eighteen months after the denial of the attorney's motion, the petitioner filed a pro se motion requesting modification of his sentence, which was denied. Nine months later, believing he could still file a habeas petition, the petitioner filed one pro se. See id. at 149.

The Court of Appeals remanded the case to the district court to determine whether, in light of these circumstances, the petitioner acted diligently up until the date on which he filed a

13

pro se petition, over thirty months past the AEDPA's deadline. See id. at 149-50, 153. On remand, the district court concluded that Petitioner had indeed demonstrated reasonable diligence. See United States v. Baldayaque, Nos. 95-CR-0081, 99-CV-2272, 2004 WL 2472270, at *2 (D. Conn. Oct. 28, 2004).

A client who is well-versed in the law, highly capable of filing his own petition, and has the ability to effectively evaluate his lawyer's performance and remedy any problems, on the other hand, is less likely to demonstrate reasonable diligence. See Doe, 391 F.3d at 178. In Doe, for example, the petitioner retained his attorney to pursue remedies in state court and to assist with any sentencing issues in federal court. See id. at 176. Preparing to file a habeas petition, therefore, was outside the scope of the attorney's representation. See id. at 176-77. The significance of the petitioner's failure to discuss the necessary steps for pursuing a habeas petition with his attorney was compounded by the petitioner's "extensive experience with legal representation and the legal system." Id. at 177. His status as a "self-professed lay student of the law" similarly qualified the petitioner's ability to evaluate his lawyer's performance. Id. The attorney's refusal to answer questions regarding his case, request to wire a retainer fee to his wife's bank account, lack of a proper office, and failure to maintain contact were all signs that, given the petitioner's educational background and "legal

14

sophistication," should have led to the realization that the attorney was not "maintaining a viable law practice." Id. Lastly, the petitioner had the financial and logistical ability to hire another attorney, as evidenced by his retainment of a second lawyer to handle concurrent charges and his eventual replacement of the allegedly incompetent attorney with a third. See id. at 177-78. Taken together, the petitioner's "privileged position relative to most habeas petitioners," as well as his failure to demonstrate a desire to take the steps necessary to file a habeas petition in a timely fashion, rendered his actions insufficiently diligent to justify equitable tolling. Id. at 178.

In the instant case, the circumstances surrounding Harmel's retention, the scope of his representation, and Petitioner's lack of sophistication regarding legal representation indicate that Petitioner exercised reasonable diligence. As in Baldayaque, Petitioner retained Harmel as soon as possible after his request for leave to appeal to the New York Court of Appeals was denied with the specific expectation that Harmel would file a habeas petition in a timely manner. Moreover, Petitioner and his sister continually contacted Harmel's office to inquire into the status of his case. While Harmel could not recall affirmatively telling Petitioner or Ms. Cartagena that the habeas petition was being worked on or already filed, his admitted memory lapse due to heavy medication, as well as the Court's finding of credibility

15

regarding the testimony of Petitioner and his sister, suggests that Petitioner and his family were told at least twice that they "had time" and that an extension would be possible if any problems arose. (Hr'g Tr. 43, 46-47.)

Moreover, unlike the petitioner in Doe, Petitioner in the instant case was unable to assess the severity of deterioration of Harmel's practice, and did not possess the ability to retain new counsel. Despite repeated phone calls, Petitioner and his sister were not told of the arrest of Harmel's paralegal, the loss of his file, or the severe decline in Harmel's health; rather, Petitioner was led to believe that Harmel was simply busy working on other matters. In contrast to the petitioner's "legal sophistication" in Doe, Petitioner in the instant case testified that he "didn't know anything about the law" and was trusting Harmel to follow through on their agreement. (Hr'g Tr. 53.) As in Baldayaque, Petitioner's reliance on Harmel was reasonable. While the record does not reveal specific information regarding Petitioner's financial status during this period, his subsequent pro se petition, Harmel's observation in the April 2004 letter that he had received very little money, and the necessity of the Court appointing counsel for Petitioner, suggest that retaining a new attorney was not an option. Finally, while Petitioner was fluent in English and capable of writing his own Petition, a petitioner's situation need not "be as extreme as Baldayaque's in order to demonstrate

reasonable diligence." Doe, 391 F.3d at 178.

CONCLUSION

For the reasons set forth herein, the Court finds Petitioner's petition for a writ of habeas corpus timely. In light of the fact that Petitioner was appointed counsel since the filing of his Petition, the Court grants Petitioner thirty (30) days from the date of this Order to submit a supplemental brief on the merits of the Petition, and Respondent fourteen (14) days to respond to Petitioner's supplemental brief.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: Central Islip, New York
March 3, 2008

17